UNITED STATES OF AMERICA
DISTRICT COURT OF MASSACHUSETTS

| | |
|---|---|
| **KENNETH R. MITCHELL and CHARLENE M. GIANTOMMASO,** on behalf of themselves and all others similarly situated, <br> **Plaintiffs,** <br> v. <br> **GLOBE NEWSPAPER COMPANY,** <br> **Defendant.** | Civil Action No. <br> 1:08-cv-12160-JLT <br><br> (Suffolk Superior Court <br> Civil Action 08-5285) |

**PLAINTIFFS' MEMORANDUM OPPOSING**
**DEFENDANT'S MOTION TO DISMISS**

STEPHEN R. DOMESICK, ESQ.
7599 SEASHELL CREST LANE
LAKE WORTH, FL 33467-6972

## I. INTRODUCTION

Plaintiffs are part-time employees who accrued vacation by working at the Globe between March 1 and July 6, 2007 under a 1:25 formula.[1] The Globe paid for the shifts worked at the rate in effect during that period,[2] but balked at using that rate to pay them for the earned vacation.

The employees sued in state court to get paid for their 2007 earned vacation at the same rate used by the Globe to pay them for the shifts worked from March through July 6, 2007. Nothing in the labor agreement affects this state-law right to be paid their full wages for the work they performed. Under the Massachusetts Wage Payment Act, G.L. c. 149, § 148, also grants the workers treble damages, costs and attorney's fees.[3]

All of the evidence needed to calculate the Globe's pay liability is found in spreadsheet data already produced by its Payroll Department. See Exhibits 1, 2 and 3 to Declaration of Stephen R. Domesick, Esq.

In addition to the name, ID number, Job code and shifts worked in 2007 of each plaintiff, the following data are included:

1. Each employee's pay rate in effect during the period March 1 through July 6, 2007.
2. The shifts worked by the employee during that earnings period.
3. The number of vacation days accrued by each employee during that earnings period.
4. The pay rate the Globe used to pay the employee's deferred vacation wages for that earnings period.

---

[1] " All Union personnel, other than situation holders, who from time to time work as extras for the Globe shall receive a maximum of one (1) day for each 25 shifts worked."

[2] With one minor exception, during this period "the rate of wages shall be $223.473 per day or night shift...."

[3] Economic self-interest envelopes the Globe's attempted dismissal the case like a sheet of water. Defendant acknowledges that under § 148 the plaintiffs' damages will be "substantial." Letter to the Attorney General's Office dated May 7, 2008, "Re: Vacation Pay - Request for Opinion", Exhibit B to Plaintiffs' Memorandum in Support of Its Motion to Remand.

## II. EARNED VACATION IS PAYABLE AS PART OF WAGES UNDER STATE LAW

### A. Finally, a Massachusetts Wage Payment Suit That Does Not Need An Interpretation of The Collective Bargaining Agreement

The guiding precepts are well known. LMRA § 301 preempts a state-law claim if the claim requires the court to decide "a real interpretive dispute and not merely a pretended dispute" of a collective bargaining agreement. *Martin v. Shaw's Supermarkets, Inc.*, 105 F.3d 40, 42, 154 LRRM 2257 (1st Cir. 1997). But "the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished." *Lydon v. Boston Sand & Gravel Co.*, 175 F.3d 6, 10, 160 LRRM 2981 (1st Cir. 1999)(quoting *Livadas v. Bradshaw*, 512 U.S. 107, 124, 146 LRRM 2513 (1994)).

No preemption may occur on "purely factual questions about an employee's conduct or an employer's motives escape preemption. So too litigation that refers to a collective bargaining agreement merely in passing." *George v. AT&T Corp.*, 179 LRRM 3205, 3209 (D. Mass. 2006) (citing *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 404, 128 LRRM 2521 (1988)).

Nonetheless, defendant argues that the last word on preemption of § 148 claims "has already been [spoken] by this Court," citing *Caswell v. Ferrara & Sons, Inc.*, 2002 WL 31986854, at *3 (D. Mass. July 30, 2002) (Tauro, J.).[4] Defendant's Memorandum at 3.

Lawyers like to argue from abstractions like "complete preemption," but they are rarely self-executing, and it is perilous to ignore pertinent facts and the actual consequences of their blind acceptance.

*Caswell* was rightly decided because its state-law claim depended entirely on how one

---

[4] The Court's decision in *Caswell* is Exhibit A hereto.

interpreted a manifestly ambiguous contract clause:

> Because resolution of Plaintiffs' claims requires interpretation of Section 12 of the CBA (i.e. *whether the CBA required employees to still be employed on the vacation year anniversary date, despite having worked the prerequisite hours the year before*), state law is preempted and federal labor law principles must be employed to resolve the dispute. *Id.* (Italics added).

Arbitral literature is awash with decisions on that same contract question — is an employee entitled to pro-rated, full or no vacation benefits when he quits, retires or is terminated before the specified vacation accrual date in the contract? The answer depends on the contract.

Resolution of that question is grist for every arbitrator's mill.  See, *e.g.*, *Phalo Corp.*, 52 LA 837, 838 (Murphy 1968); *Apex Ready-Mix Concrete Co.*, 58 LA 1111, 1116-17 (Kates 1972); *Infant Socks, Inc.*, 51 LA 400, 403 (Moberly 1968); and *Telescope Folding Furniture Co.*, 49 LA 837, 839 (Cox 1967), in which Professor Cox noted: "Each labor contract stands on its own feet. ... In the long run, only confusion and misunderstanding would result from attaching different legal consequences to substantially the same words."

This need for uniformity, of course, is the rationale espoused by the Supreme Court for creating § 301 preemption. *Lingle,* 486 U.S. at 404 ("[§] 301 mandate[s] resort to federal rules of law in order to ensure uniform interpretation of collective-bargaining agreements, and thus to promote the peaceable, consistent resolution of labor-management disputes").

But the *Lingle* rationale has no application in this case — there is no contingency, no ambiguity and no interpretation is required. The meaning of vacation and pay clauses is plain and clearly conveys the distinct idea that workers accrue vacation on the basis of 1:25 shifts worked and they are paid their wages at the rate of pay in effect when they did the work.

Unlike *Caldwell,* the fundamental truth here is that plaintiffs' right to their earned

vacation pay is "'independent' of the collective-bargaining agreement in the sense that 'independent' matters for Section 301 pre-emption purposes: resolution of the state-law claim does not require construing the collective-bargaining agreement." *Lingle, supra.*

Section 148 mandates that accrued vacation pay earned under an oral or written contract, like all wages paid in Massachusetts, must be paid at the same rate used by the Employer to pay for the services when rendered.

In March, 2008 the Globe unlawfully refused to pay these part-time workers their 2007 vacation wages at the rate it paid them for the work - $223.47 per shift. The Globe broke the law and nothing in the expired contract says anything to the contrary.

Unlike *Caswell,* this "controversy concerns the plaintiff's rights under state ... statutes which exist independently of the collective bargaining agreement and do not require interpretation of that agreement." *Ralph v. Lucent Technologies, Inc.,* 135 F.3d 166, 171*,* 157 LRRM 2466 (1st Cir. 1998) (citations omitted). The answer does not depend on the contract that expired on July 6, 2007 nor the contract that went into effect the next day.

      **B**.      **State Law, Not the Labor Agreement, Establishes Defendant's Liability**

Every Massachusetts employer, union and non-union, is subject to G.L. c. 149, § 148. The Act requires that the employer tender payment of "wages" to its employees within specified time periods. And it defines vacation pay as wages: "the word 'wages' shall include any ... vacation payments due an employee under an oral or written agreement." *Id.* The statute protects workers by further providing that "no person shall by a special contract with an employee or by any other means exempt himself from this section ...." *Id.*

Globe part-time employees earn their vacation under the contractual "shifts worked"

4

formula. Vacation earned in one calendar year is deferred until the following year "on a 'use it or lose it' basis." Because vacation pay is simply deferred wages, it has to be paid at the rate paid for the work itself and no Globe contract has ever said anything to the contrary.

The "Advisory from the Attorney General's Fair Labor Division on Vacation Policies" (1999/1) confirms that deferred pay for earned vacation must be paid at the work rate:

> Employers who ... provide paid vacation to their employees must treat those payments like any other wages under M.G.L. c. 149, s. 148. *See Massachusetts v. Morash*, 490 U.S. 107 (1989). *Like wages, the vacation time promised to an employee is compensation for services which vests as the employee's services are rendered.* (Italics added).

For the 128 days that began on March 1, 2007, Globe part-timers were paid at the rate of $223.47 for each shift worked, accruing their paid vacation under the contact's 1:25 formula.

Under the Wage Payment Act, their deferred vacation pay, like all their wages, has to be paid at the rate in effect when they performed their services. The Globe violated § 148 because a year later, in March, 2008, it refused to pay their 2007 earned vacation at that $223.47 rate. Complaint, ¶ 12.[5]

No Globe collective bargaining agreement affects the § 148 right at stake here: the right to be paid wages at the rate in effect when the services were rendered. That is an express right created under the Wage Act and nothing in the collective bargaining agreements does anything to alter that right.

There is no § 301 preemption of this state court action for nonpayment of wages. The class action complaint must be remanded to Suffolk Superior Court.

---

[5] Retired Globe employees who work part-time are paid at the shift rate in effect on the date of retirement (the "Pre-Retirement Rate"). Complaint, ¶ 5. When it came time to pay part-time employees for vacation they earned prior to July 7, 2007, the Globe used a lower shift rate of $156.38 for all the workers, including the Retirees. Complaint, ¶ 8.

5

### C. Plaintiffs' Right To Vacation Pay Is a Factual Question That Is Settled By Looking At, Not Interpreting, The Agreement

The question seems straight-forward enough: is the claim for deferred wages "substantially dependent on analysis of a CBA's terms" or not? *See Lydon v. Boston Sand & Gravel Co.*, 175 F.3d 6, 10, 160 LRRM 2981 (1st Cir. 1999), (citing *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 118 LRRM 3345 (1985)).

To many observers, § 301[6] looks like thin gruel to give rise to universal federal preemption. Perhaps that is why the Supreme Court cautioned the lower courts that § 301 "cannot be read broadly to pre-empt nonnegotiable rights conferred on individual employees as a matter of state law." *Livadas v. Bradshaw*, 512 U.S. 107, 123, 146 LRRM 2513 (1994).

And so it is that a worker's right to be paid full wages is an independent, nonnegotiable right founded in the Massachusetts Pay Act and in a federal statute as well, the Fair Labor Standards Act, 29 U.S.C. §201, *et seq*. Under both Massachusetts and federal law, workers are entitled to a minimum wage, overtime pay after 40 hours and to be paid on the payday for the pay period covered.

Importantly, just like G.L. c. 149, § 148, the FLSA does not mandate that workers get vacation with pay. That is a matter of contract with the employer under both laws. Such a written agreement for earning vacation exists here, but actually getting paid those deferred wages is a state-law right. In just such circumstances, the First Circuit has made clear — "We hold that these rights are not to be preempted by the collective bargaining agreement." *Ralph v. Lucent,*

---

[6] LMRA Section 301 establishes federal jurisdiction for "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce." 29 U.S.C. § 185(a). The Supreme Court

*supra,* 157 LRRM at 2470.

The state-law right of workers to be paid deferred wages in full is "within the traditional police power of the State" and its preemption "should not be lightly inferred." *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 21,125 LRRM 2455.

Because this case does not present the "real interpretive dispute" of a CBA required by *Martin v. Shaw's Supermarkets, supra,* 105 F.3d at 42, defendant's reliance on the case is unavailing. In *Martin*, a proviso in the Massachusetts statute directed an interpretation of the contract to ascertain if "conflict" with the law existed.[7] When no such analysis is required, the State's interest in protecting workers is paramount:

> Massachusetts has an independent interest in regulating injury compensation and apart from the proviso the elements of both [of the plaintiff's] state-law claims appear to be independent of bargaining agreement provisions. *Id*. at 41.

Here, too, " Massachusetts has an independent interest in" having its citizens paid for their labor and plaintiffs' § 148 "state-law claims appear to be independent of bargaining agreement provisions." The workers' deferred vacation earnings is a fact-determined matter of attendance records; no interpretation of the contract is necessary. The records from the Globe's Payroll Department show all the facts need for adjudication under § 148. Those records are before the Court as Exhibits 1, 2 and 3 to the Declaration of Stephen R. Domesick.

"Courts confronted with state law claims must therefore locate the line between the need for mere consultation of a CBA ... and ... active interpretation of that agreement...." *Lydon*, 175 F.3d at 10.

---

[7] " In the event that any right set forth in this section is inconsistent with an applicable collective bargaining agreement, such agreement shall prevail." G.L. c. 152, § 75B(3).

The First Circuit's opinion in *Vargas v. Geologistics Americas*, 169 LRRM 2859, 2861 (1st Cir. 2002), illuminates that well-trod path. Former employees sued, claiming a right to severance pay under a Puerto Rican law that mandated compensation to workers terminated "without just cause."

"[A]chievement of the just cause standard in the review of disciplinary actions ... replac[es] unilateral management authority with impartial, third party review [of] two separate issues ... "whether there was just cause for the imposition of discipline for a particular wrongdoing, and whether there was just cause for the penalty." See Bornstein, Gosling & Greenbaum, LABOR AND EMPLOYMENT ARBITRATION (2nd Ed.), § 14.03[1]. Statutory attempts at defining "just cause" fare no better. "It is impossible to quantify precisely the protection given employees against unjust dismissal by legislation." Summers, *Individual Protection Against Unjust Dismissal: Time for a Statute*, 62 VA. L.REV. 481(1976).

Apart from the inherent ambiguity of the "just cause" standard, the First Circuit saw a second problem in *Vargas*— the potential for conflicting interpretations between the contract and the law: "in the event that a termination found not to be in violation of the CBA could otherwise be adjudged without just cause under Law 80, the uncertainty caused by the application of two systems of law would undermine the policy of uniformity in labor law administration. We therefore hold that all claims in the complaint are preempted by federal labor law." *Id.* (citation omitted).

Plaintiffs' § 148 right to their wages has no potential for conflict under either spike of the *Vargas* analysis.

This case also avoids preemption under the Circuit's analysis in *Sullivan v. Raytheon Company* because there is no potential conflict between § 148 and a management rights clause.

The Globe has no management rights clause in its collective bargaining agreements covering the plaintiff class. 262 F.3d 41, 168 LRRM 2129, 2133 (1st Cir. 2001) (finding preemption because of "a potential conflict with the management rights clause in a collective bargaining agreement").

Because there is no management rights clause here, no fact-finder ever need wrestle with the "faintly troubling" possibility that *Sullivan's* potential for conflict could defeat plaintiffs' § 148 right to payment of their deferred wages. *Id.*

The right of these 80 part-time workers to be paid is not contingent on any contract interpretation. The shifts have already been worked under the 1:25 formula and paid for at the $223.47 rate. Section 148 kicks in now because "the word 'wages' ...include[s] any ... vacation payments due an employee under [that] written agreement." The statute is just that clear and the case is just that simple.

**D. Plaintiffs' State-Law Claim Does Not "Depend" On The "Meaning" Of The Collective Bargaining Agreement**

If a state-law claim depends on the meaning of the collective bargaining agreement in either of two ways – under *Rawson*'s prescriptive "duty"[8] or *Allis-Chalmers'*s "interpretation" rubric[9] – it gets preempted. See *Filbotte v. Pennsylvania Truck Lines, Inc.*, 131 F.3d 21, 26, 156 LRRM 3132 (1st Cir. 1997).

Plaintiffs' wage claim is not tort-related, so there is no basis for preemption under *Rawson.* And the second path to preemption ends well short of defendant's goal.

---

[8]  *Steelworkers v. Rawson*, 495 U.S. 362, 369, 134 LRRM 2153 (1990).

[9]  *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 220, 118 LRRM 3345 (1985).

Shorn of its unbridled advocacy, the Globe's effort to avoid paying the deferred portion of the workers' wages is merely a battle of interests masquerading as a contest of principles.

The Wage Act has established a universal commandment — there shall be no retroactive pay cuts allowed for wages already earned under an agreement with a Massachusetts Employer. Every worker, even the Globe's part-time employees have the state-law right to be paid their deferred wages at the rate in effect when the work performed. Enforcement of that state-law right rests on a single fact – when plaintiffs worked from March 1 through July 6, 2007, they earned vacation under a contract's 1:25 formula.

For this reason, alone, defendant's attempt to recast plaintiffs' § 148 wage claim as a "hybrid § 301/duty of fair representation" case is wrong. No language in a Globe labor contracts must be interpreted to entitle plaintiffs to be paid at the $223.47 rate.[10]

Whatever the length of the § 301 continuum, the facts in this case prove that "There is nothing novel about recognizing that substantive rights in the labor relations context can exist without interpreting collective bargaining agreements." *Lingle*, 486 U.S. at 411.

The Globe rejects the principle that "vacation payments" under § 148 are "earned wages deferred". But no matter how the Globe tortures the facts, the collective bargaining agreement will not confess to two rates of pay for the same work. There is but a single pay rate involved here — the shift rate that was in effect when the plaintiffs performed their work and got paid for it in 2007 — $223.47. The Globe does not linger over these facts in its effort to evade paying

---

[10] " The hybrid action combines a claim against the employer under § 301 of the LMRA ... for violating the collective bargaining agreement and a claim of unfair representation against the union under the National Labor Relations Act..... Such a suit amounts to a 'direct challenge to the private settlement of disputes under [the collective bargaining agreement].' *Doty v. Sewall*, 784 F.2d 1, 4 (1st Cir. 1986) (citation omitted).

treble damages for its underpaying these workers, all for its own aggrandizement.

As the First Circuit has matter-of-factly stated:

> A suit is customarily deemed to arise under the law that gives birth to the cause of action. Applying that approach, this suit is based upon, and, therefore, arises under, state law.[11]

For the half-million or so people in this Commonwealth whose wages and vacation entitlement are spelled out in a Union contract, preemptive federal jurisdiction over their § 148 rights cannot be reconciled with the plain-spoken state law that grants them full pay and treble damages, their costs and attorney's fees from an offending Employer.

E.    **"Who You Gonna Believe, Me or Your Own Eyes?"[12]**

The contract that expired on July 6, 2007 required the Globe to pay its part-timers $223.47 for each shift they completed before that day's end. For working those shifts they were paid at that rate. Plaintiffs earned deferred vacation pay for those shifts under the 1:25 formula.

None of plaintiffs' deferred vacation rights were earned under the successor agreement that went into effect on July 7. That new contract is patently clear and unambiguous — the new, lower shift rates are payable only for work performed after the "signing and ratification of the contract...." That new contract was ratified by a secret ballot vote on July 7, 2007; it contains no provision for retroactive pay.

---

[11] *American Policyholders*, 989 F.2d at 1262 (footnote and citations omitted); See also *Franchise Tax Bd. v. Construction Laborers Vacation Trust*, 463 U.S. 1, 13 (1983) ("straightforward application of the well-pleaded complaint rule precludes original federal-court jurisdiction" where state law supplies all elements necessary to establish defendant's liability"); *Hunneman Real Estate*, 660 F. Supp. at 911 (remanding for lack of jurisdiction where, "[i]n order for the plaintiffs to prevail, they do not have to prove or rely on any proposition of federal law").

[12] Chico Marx in F. Shapiro, YALE BOOK OF QUOTATIONS at 497.

In the Spring of 2008, when it came time to pay the plaintiffs for their 2007 accrued vacation, the Globe balked at using the $223.47 rate, despite the mandate of § 148.

Nothing in the new contract affects the workers' rights under the old agreement. Plaintiffs' earned wages between March 1 and July 6, 2007 at the rate spelled out in that expired agreement – $223.47.

Any claimed need for "interpretation" stretches the meaning of that word beyond all recognition.

### III. CONCLUSION

Defendant's motion to dismiss should be denied and plaintiffs' motion to remand to Suffolk Superior Court should be granted.

                                              Respectfully submitted,

                /s/    Stephen R. Domesick
                     STEPHEN R. DOMESICK
                     Counsel for Plaintiffs
                     7599 Seashell Crest Ln.
                     Lake Worth, FL 33467
                     Tel: 561-439-8515 / Fax: 561-963-7589
                     Email: sdomesick@comcast.net

### CERTIFICATE OF SERVICE

I hereby certify that on January 24, 2009 a true and correct copy of the foregoing document was served on all counsel of record via the Court's Electronic Filing System (ECF), and sent via U.S. Mail to all counsel listed on the ECF system as not receiving electronic service.

                /s/    Stephen R. Domesick
                     Stephen R. Domesick